# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-0441V

| | |
|---|---|
| T.S., | Chief Special Master Corcoran |
|          Petitioner, | |
| v. | Filed: November 19, 2024 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Refiled as Redacted: February 7, 2025 |
|          Respondent. | |

*Brynna Gang, Kraus Law Group, LLC, Chicago, IL*, for Petitioner.

*Mitchell Jones, U.S. Department of Justice, Washington, DC*, for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On January 11, 2021, T.S. filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.* (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as the result of an influenza ("flu") vaccine received on November 11, 2019. Petition (ECF No. 1). For the reasons discussed below, I find that Petitioner has preponderantly established the onset of left shoulder pain within 48 hours post-vaccination, and she is otherwise entitled to compensation for a Table SIRVA. I also conclude that her actual pain and suffering warrants an award of $95,000.00.

---

[1] When this Ruling was originally filed, I advised my intent to post it on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the EGovernment Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), Petitioner filed a timely motion to redact certain information. This Ruling is being reissued with reduction of Petitioner's full name down to her initials throughout the Ruling on Entitlement and in the case caption. Except for those changes and this footnote, no other substantive changes have been made. This Ruling will be posted on the court's website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, with no further opportunity to move for redaction.

I. **Procedural History**

In May 2021, the claim was assigned to the Office of Special Masters' Special Processing Unit ("SPU") (OSM's adjudicatory system for expedited resolution). ECF No. 10. In June 2024, Respondent completed his review of the medical records, and advised that he would be opposing compensation. ECF No. 14. Respondent completed his medical review and entered into settlement discussions in July 2022, but those discussions hit an impasse a year later. ECF Nos. 32, 45. Thus on December 6, 2023, Respondent filed his Rule 4(c) Report, in which he solely disputed Petitioner's showing of onset within the period required for a Table SIRVA. ECF No. 48. The parties subsequently submitted briefing. Petitioner's Entitlement and Damages Brief filed Mar. 25, 2024 (ECF No. 55); Respondent's Entitlement Response filed May 24, 2024 (ECF No. 57); Respondent's Damages Response filed July 26, 2024 (ECF No. 60); Petitioner's Reply filed August 5, 2024 (ECF No. 61). The matter is ripe for adjudication.

II. **Evidence**

I have reviewed all submitted evidence including all medical records and affidavits, as well as the Petition, the Rule 4(c) Report, and both parties' briefing. The following section focuses on the evidence most relevant to 1) the injury's onset, and 2) the resulting pain and suffering.

Petitioner was born in 1977. For at least three years prior to vaccination, she did not have a primary care provider, and never evidenced left shoulder pain or dysfunction. Rule 4(c) Report at 1 - 2. She was employed as a medical researcher, at a hospital in Wisconsin. Ex. 1 at 378, 428. As a work requirement and at her workplace, the at-issue flu vaccine was administered in Petitioner's left arm on November 11, 2019. Ex. 4 at 1; Ex. 5 at ¶ 5.

The earliest evidence of an injury is found in Petitioner's workplace incident report, submitted on the morning of December 23, 2019 (six weeks post-vaccination). Ex. 7 at 1; Ex. 11 at 1. In it, Petitioner reported an injury beginning on November 11th at 10:47 a.m., when she had received the flu vaccine from occupational health. Ex. 7 at 1; Ex. 11 at 2. Earlier that morning, her work had involved "regular typing as usual – nothing strenuous or out of ordinary," and "both arms were perfectly normal in function and without any pain." *Id.* Petitioner described subsequent difficulties raising her left arm, lifting a small package, and pushing a door. *Id.* She described resting the shoulder in hopes that it would improve on its own to no avail, and therefore, she was planning to seek medical treatment. *Id.*

Later in the day on December 23rd, Petitioner was evaluated by a primary care physician ("PCP") at her employing hospital. Ex. 1 at 410.[2] The PCP recorded:

> Patient with history of left shoulder pain. This began approximately 3 to 4 weeks after having a flu vaccine administered in the left deltoid. She shows me the region where this vaccine was given, and it was provided in the appropriate place in the upper outer quadrant of the deltoid itself. Tenderness in this area ensued, and patient did not move the arm significantly over the next few weeks. Then she began noticing it was difficult and painful to abduct the arm significantly…

*Id.* On exam, Petitioner's left shoulder had no tenderness to palpation, but passive range of motion ("ROM") was limited by pain and resistance. *Id.* at 411. The PCP assessed: "[l]ikely adhesive capsulitis secondary to decrease[d] use. Seems to have ensued after influenza vaccination. Unclear if she did not use this arm for a number of weeks secondary to tenderness at the site of the vaccination." *Id.* The PCP recommended that Petitioner continue taking ibuprofen (200 mg up to four times per day) and start physical therapy ("PT"). *Id.* at 402, 411.

On her December 26, 2019, PT new patient questionnaire, Petitioner reported "pain left arm, decreased ROM. Occurred after flu shot in the left arm [on] 11/11/2019." Ex. 1 at 386. The therapist similarly recorded:

> [L]eft shoulder pain that started after receiving the flu shot on 11/11/19. Immediate onset of shoulder pain but able to move her shoulder the rest of the day after the flu shot. Progressively started to lose range of motion over the next couple of days/ weeks. Initially ignored the soreness and contributed [sic? attributed?] it to the normal soreness from the flu shot but symptoms continued to persist. Reports significant increase in pain on Monday 12/23 when trying to push open a door – that's when she finally went to the MD.

*Id.* at 377. The pain rated at 6/10 currently; ranged from 1 – 9/10; was aggravated by activity; and eased by rest, heat, and ibuprofen. *Id.* An exam found pain and reduced ROM. *Id.* at 380. The therapist considered diagnoses of tendinitis or bursitis, with "likely exacerbat[ion] by lack of use… over the past month." *Id.* at 381.

---

[2] The PCP did not sign the December 23, 2019, record until three months later. Ex. 1 at 410. But other notations indicate that the encounter occurred at about 5:00 p.m. *Id.* at 404, 406.

On December 30, 2019, Petitioner was placed on temporary total disability from work. Ex. 7 at. 2. The next day (December 31, 2019), a primary care physician's assistant ("PA") recorded that Petitioner had "left shoulder pain that started after a flu shot in that arm… She had been severely restricting her ROM of the left shoulder due to the pain and it was worsening." Ex. 1 at 354. The pain was worse with computer work, driving, and sleeping. *Id.* Petitioner was told to continue conservative pain measures (e.g., heat, OTC medications). *Id.* at 356. As of December 30, 2019, Petitioner was placed on temporary total disability leave from her medical research job. Ex. 7 at 2.

Petitioner attended PT sessions on December 31, 2019, and January 2 and 3, 2020. Ex. 1 at 337-39, 321-23, 303-8 (organized chronologically). At a January 6, 2020 follow-up, the PCP reviewed that Petitioner had experienced post-vaccination site pain, followed by pain-protective behavior of the left shoulder, and decreased ROM which he believed was "secondary to weeks of immobilization." Ex. 1 at 283. These "symptoms and time course to development of pathology [were] consistent with frozen shoulder or adhesive capsulitis." *Id.* Because PT was causing "significant discomfort," the PCP ordered an MRI of the shoulder to ensure there was no other internal derangement, significant rotator cuff pathology, or other inflammatory disease. *Id.* The MRI visualized an intact rotator cuff and glenoid labrum, but trace fluid in the subacromial/ subdeltoid bursa. Ex. 3 at 18. Accordingly, the PCP instructed Petitioner to continue PT. Ex. 1 at 283. While working, she should sit in a high-backed chair and reconfigure her workstation to better support her shoulder and neck. *Id.* at 297. That same date, Petitioner was moved to temporary *partial* disability. Ex. 7 at 2. She attended further PT sessions on January 7 and 9, 2020. Ex. 1 at 267 – 69, 250 – 52.

On January 12, 2020, Petitioner's temporary partial disability ended. Ex. 7 at 2. Around this time, she resigned from work because of her ongoing shoulder injury, and because she was ineligible for unpaid medical leave. *See, e.g.*, Ex. 1 at 195. As a result, she lost her employer-sponsored health insurance, and was dependent on workers' compensation to cover any further medical treatment of her shoulder. Ex. 5 at ¶ 26; Ex. 15 at ¶ 9. At further PT sessions on January 14, 16, 21, 23, and 28, 2020, the physical therapist recommended orthopedic evaluation and a steroid injection. Ex. 1 at 232 – 36, 214 – 17, 195 – 99, 176 – 80, 160 - 63.

On January 29, 2020, upon establishing care with an orthopedic surgeon, Petitioner reported that the vaccine she had received had caused immediate pain, and by the following day she could not abduct her arm. Ex. 2 at 6. She was "miserable," and was "uninterested in returning back to physical therapy as she could not tolerate her therapy." *Id.* A physical exam found "smooth" passive ROM, rotator cuff strength with forward flexion and abduction that was "mildly limited due to pain," and positive

impingement signs. *Id.* at 7. The orthopedist assessed SIRVA, rotator cuff bursitis, and adhesive capsulitis, and administered a subacromial steroid injection. *Id.*

At further PT sessions on February 4 and 6, 2020, Petitioner was assessed to have impaired tolerance to exercises for strengthening and stabilization, but improved ROM and pain levels – which Petitioner attributed to rest, not working, and the recent steroid injection. Ex. 1 at 144 – 47, 127 – 31.

At a February 11, 2020, primary care appointment, Petitioner reported that her left shoulder was "finally improving." Ex. 1 at 106. The PA confirmed "significantly increased ROM from 1 month ago," prescribed Celebrex (because Petitioner reported stomach discomfort and sedation with the ibuprofen she had been taking for months), and discouraged driving for more than 1 hour at a time. *Id.* at 106 – 08, 122.

Petitioner attended further PT sessions on February 11, 13, 18, and 25, and March 9, 2020. The records reflect pain "flaring" with activity and improved with rest. Ex. 1 at 87 – 90, 67 – 70, 49 – 52, 31 – 34, 13 -17. After March 9, 2020, Petitioner discontinued formal PT without achieving her goals, and there is no formal discharge summary.[3]

At a March 11, 2020, orthopedic follow-up, Petitioner confirmed that the steroid injection had temporarily relieved her shoulder pain, but she had two flareups which dictated pauses in her therapy; she had significant fatigue and tiredness after very little activity. Ex. 2 at 10. The orthopedist assessed that despite a "slight loss of terminal internal land external rotation," and ongoing "discomfort with rotator cuff testing and strength," the shoulder was "significant[ly] improved." *Id.* at 11. He recommended home exercises for strengthening, plus prescription meloxicam and cyclobenzaprine. *Id.*

On May 15, 2020, Petitioner reported increasing pain, and her orthopedist administered a second subacromial steroid injection. Ex. 2 at 13 – 14. Three months later (on August 14, 2020), Petitioner reported that a workers' compensation independent medical examination ("IME") that day had "really flared up her shoulder." Ex. 2 at 17.[4] Her

---

[3] Petitioner does not allege that the COVID-19 Pandemic had any impact on her treatment course. *See generally* Exs. 5, 15; Brief; Reply.

[4] Starting in August 2020, the IME physician (also an orthopedic surgeon) opined that Petitioner's vaccine injury (which he characterized as "deltoid inflammation") had resolved within six months, and that any ongoing deficits and treatment were unrelated and should not be covered by workers' compensation. *See, e.g.*, Ex. 7 at 43, 9 (organized chronologically). However, that individual was focused on scrutinizing, and limiting the scope, of her workers' compensation claim. I also note that Respondent has not seriously argued that the injury resolved this quickly – which would endanger Petitioner's basic eligibility for the

orthopedist's exam found crepitus; weakness; painful and limited ROM; and positive impingement signs. *Id.* X-rays showed a "possible impinging lesion." *Id.* The orthopedist assessed Petitioner with rotator cuff impingement syndrome and extensive subacromial bursitis secondary to SIRVA with recalcitrance to physical therapy; temporary relief from steroid injections; and continued "relapse[s]." *Id.* The orthopedist did not support repeated steroid injections for Petitioner's "young age" and clinical picture, or renew the prescriptions for meloxicam and cyclobenzaprine – instead recommending surgical bursectomy and subacromial decompression. *Id.*

Workers' compensation denied any further coverage of Petitioner's injury. Ex. 2 at 20; Ex. 10 at 5 – 7, 24 – 29. That coincided with a seven-month gap in medical treatment (for her shoulder or other concerns). Petitioner avers that in or around March 2021, she started working again as a clinical research project manager. Ex. 5 at ¶ 14. She also gathered up some money for reevaluation of her shoulder, while waiting for her employer-sponsored health insurance to kick in. *Id.*

At a March 29, 2021, orthopedic follow-up, Petitioner reported that her left shoulder had been "slowly worsening since" the last appointment. Ex. 10 at 5. An exam found passive ROM limited "in all planes… most limited in external-internal rotation," and mild weakness due to pain. *Id.* X-rays were unremarkable, but the orthopedist maintained his previous assessments of SIRVA, subacromial bursitis, and adhesive capsulitis; still recommended surgery; and prescribed cyclobenzaprine 10 mg nightly for pain. *Id.* at 6.

On April 27, 2021, Petitioner complained: "the IME keeps stating her original [January 2020] MRI is unremarkable and does not acknowledge her adhesive capsulitis." Ex. 10 at 39. Accordingly, three days later, she underwent a repeat MRI. *Id.* at 30. On May 3, 2021, the orthopedist wrote that the repeat MRI's images "demonstrate[d] a notable thickening of the inferior glenohumeral ligament," as well as "ongoing rotator cuff tendinosis and bursitis." *Id.* at 12. He administered a glenohumeral joint steroid injection, in addition to recommending ongoing home exercises and laser therapy – which she started on May 11, 2021. Ex. 10 at 12; *see also* Ex. 8 at 7 – 17.

At a July 6, 2021, follow-up, the orthopedist's exam found "stiff[ness] in total rotation in her left shoulder, but… improve[ment]." Ex. 10 at 15. He administered a second glenohumeral joint steroid injection. *Id.* at 16.

Over the next four months, Petitioner consistently attended PT (at a different practice than before) totaling 13 sessions total, concluding on November 17, 2021. She

---

Program, under Vaccine Act Section 11(c)(1)(D). More credible is the *treating* orthopedic surgeon who was focused on the accurate diagnosis and treatment of her ongoing complaints.

also attended additional laser therapy, for 30 sessions total, concluding on November 23, 2021. *See generally* Exs. 8, 9. Those therapies were somewhat beneficial, but did not fully resolve her shoulder injury. The last PT record states that she was still unable to reach fully overhead and behind her back; unable to shop for, carry, and put away groceries; and unable to perform deskwork for 60 minutes. Ex. 9 at 35. In November 2021, in light of her shoulder injury, Petitioner resigned from her job (that she had started in March 2021) and consequently lost her health insurance again. Ex. 15 at ¶ 19.

Next, on March 4, 2022, Petitioner (still unemployed, as a "self-pay patient," Ex. 15 at ¶ 20), followed up with her orthopedist. Ex. 10 at 21. The orthopedist assessed that her left shoulder ROM was "much improved" but she "still experience[s] mild stiffness with internal and external rotation in addition to pain," for which he authorized further laser therapy sessions. *Id.* at 22.

That was followed by an eighteen (18) month gap in any medical records relating to Petitioner's shoulder (or any other complaints). She avers that in "early 2022," a motor vehicle accident totaled her car. Ex. 15 at ¶ 22. Her car insurer paid for some PT sessions for a resulting lower back injury,[5] but she could not afford further medical appointments (and the associated transportation costs) for her shoulder. *Id.* Instead, she continued near-daily home exercises, rest, and OTC pain medications for her shoulder. *Id.* at ¶¶ 23 – 27. Over time her shoulder improved, and in February 2023, she secured a new medical research position that could be performed remotely – allowing her to manage the ongoing pain. *Id.* at ¶ 28.
.
On November 7, 2023, Petitioner returned for reevaluation of her left shoulder, which was conducted by an orthopedics PA. Ex. 12 at 9. She reported ongoing "pain and weakness with basic functions including reaching above her head to put things in the microwave, etc." *Id.* wished to avoid surgery, in favor of continued conservative care specifically laser therapy. *Id.* She was taking ibuprofen for pain. *Id.* at 10. On exam, the left shoulder had "slight[ly] decreased internal and external rotation, and slightly painful, nearly normal strength when tested. *Id.* at 9. The orthopedics PA assessed that Petitioner was "much better" except for "remnant posterior capsular contracture with secondary impingement, and I am optimistic this will improve with further therapy." *Id.* at 10. The provider did not impose any work restrictions, but noted Petitioner's own concern about pain with lifting and repetitive tasks. *Id.* Petitioner attended another five laser therapy sessions in January – February 2024. *See generally* Ex. 13.

---

[5] Petitioner has not filed any evidence to corroborate the motor vehicle accident, lower back injury, or related PT.

### III.     Entitlement

####    A.  Authority

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding his claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Hum. Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Hum. Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[6] a petitioner must establish that she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying QAI are as follows:

---

[6] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* Section 11(c)(1)(A)(B)(D)(E).

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (e.g., NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10) (2017).

## B. Analysis

The sole disputed issue bearing on entitlement for a Table SIRVA is whether Petitioner's left shoulder pain began within forty-eight (48) hours of vaccination. 42 C.F.R. §§ 100.3(a)(XIV)(B), (c)(10)(ii).

Respondent argues that insufficient evidence exists to support such a finding – chiefly based on his argument that the December 23, 2019, medical record notation of "*[t]his* began 3 to 4 weeks after having a flu vaccine administered," Ex. 1 at 410 (emphasis added), refers to the onset of *pain*. Entitlement Response at 8.

In contrast, Petitioner argues that the "*this* began…" phrasing is imprecise and ambiguous. The record goes on to more specifically describe "tenderness at the site of vaccination" – allowing for an inference of onset of shoulder pain that was within 48 hours post-vaccination - which was followed by "weeks of disuse" of the shoulder, resulting in decreased range of motion by the time of the December 23rd encounter (six weeks post-vaccination). Brief at 13; Reply at 3.

Petitioner's explanation of this medical record is credible – and it is corroborated by her December 23, 2019, workplace incident report, in which Petitioner reported that the injury occurred on November 11th at 10:47 a.m., upon receiving the vaccine. Ex. 11 at 1. Respondent objects that the workplace incident report was "not a medical opinion from a treating physician… rather a statement made by Petitioner." Entitlement Response at 8. But Petitioner was capable of describing her own injury, and her workplace incident report is *equally contemporaneous* to the first medical record. It is therefore entitled to similar weight (absent any specific showing why it should be doubted, which Respondent has not done here).

Moreover, the conclusion that onset occurred within 48 hours of vaccination is supported by numerous (albeit slightly later) medical records. *See, e.g.*, Ex. 1 at 377 (PT initial evaluation record, stating "immediate onset of shoulder pain"); *id.* at 282 (PCP's notation of "decreased range of motion in the shoulder over the ensuing month and a half" post-vaccination); Ex. 2 at 22 (orthopedics record of pain within one day). Even the workers' compensation physician, who disputed Petitioner's *ongoing* injury and need for treatment, accepted the "immediate onset of left shoulder pain," Ex. 7 at 40. Petitioner's later recollections simply supplement the medical records. *See, e.g.*, Ex. 5 at ¶¶ 6 – 8 (stating that she relied on her medical degree, obtained prior to moving to the United States, upon initially hoping that the post-vaccination inflammation would resolve with time and conservative pain measures). Accordingly, Petitioner has preponderantly established the Table SIRVA onset requirement.

Respondent has voiced no further objections to compensation, and I find Petitioner has otherwise satisfied all criteria for a Table SIRVA injury following receipt of the flu vaccine. There is no evidence of prior left shoulder pain, inflammation, or dysfunction or an alternative cause for Petitioner's symptoms. C.F.R. § 100.3(c)(10)(i) and (iv). Her pain and reduced ROM were limited to her left, injured shoulder. C.F.R. § 100.3(c)(10)(iii). The injury persisted for more than six months. *See* 42 Section 11(c)(1)(D)(i). Additionally, she received a seasonal flu vaccine within the United States. Section 11(c)(1)(A); Section 11(c)(1)(B)(i). And there is no evidence that Petitioner has collected a civil award for her injury. *See* Section 11(c)(1)(E). Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act.

## IV. Appropriate Compensation for Petitioner's Pain and Suffering

### A. Authority

In another recent decision, I discussed at length the legal standard to be considered in determining SIRVA damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Yodowitz v. Sec'y of Health & Hum. Servs.*, No. 21-370V, 2024 WL 4284926, at *12-22 (Fed. Cl. Spec. Mstr. Aug. 23, 2024).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[7]

### B. Analysis

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the injury's severity and duration.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

I conclude that Petitioner's pain and suffering from the November 11, 2019, vaccination was moderately severe for two years. The *initial* injury was mild – given that it was self-managed with conservative measures (e.g., rest, ice, over-the-counter pain medications) for the first six weeks. But by that point, Petitioner had moderately severe pain (ranging from 1 – 9/10) and objectively reduced ROM (assessed as adhesive capsulitis), justifying temporary leave from her medical research job.

---

[7] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

In mid-January 2020, Petitioner was ordered to return to work full-time – but she instead resigned in light of the difficulties with her ongoing shoulder injury. Workers' compensation covered *some* subsequent medical treatment, including primary care and orthopedic evaluations, imaging, 16 PT sessions, prescription pain medications, and two steroid injections. Those medical records reflect overall moderate pain levels (fluctuating, with several "flares") and moderately reduced ROM throughout spring and summer 2020. Her treating orthopedic surgeon recommended surgical intervention (specifically a bursectomy and subacromial decompression) to treat the shoulder injury beginning in August 2020. The former employer's refusal to cover surgery or other additional medical treatment, and Petitioner's lack of other resources, help to explain the August 2020 – March 2021 treatment gap. Afterwards, the treating orthopedist confirmed that Petitioner had moderately reduced ROM and pain – prompting two additional steroid injections; 13 additional PT sessions; and 30 laser therapy sessions through to November 2021. And Petitioner's shoulder was assessed to be "much improved" by the orthopedics follow-up in March 2022.

At the same time, this treatment course was followed by a substantial *treatment gap of eighteen (18 months)*, followed by medical assessments that Petitioner's shoulder had significantly improved. Petitioner acknowledges an intervening and unrelated lower back injury, and she has not furnished any evidence to corroborate that her shoulder injury continued to be a significant concern. Therefore, the pain and suffering award will be based on the conclusion that Petitioner's SIRVA was moderately severe, lasting approximately two years.

In contending that T.S.'s pain and suffering was merely "mild to moderate," *see* Damages Response at 13, Respondent does not adequately recognize the unique facts surrounding the resignation from her job and her former employer's refusal to cover ongoing treatment, including surgery, despite her treating orthopedist's recommendation. It appears more likely than not that Petitioner would have undergone surgical intervention if the cost had been covered by workers' compensation (or health insurance). This is distinct from a petitioner without any apparent obstacles standing in the way of surgical intervention.[8] And the cases cited by Respondent, awarding between $60,000.00 - $65,000.00, are distinguishable for additional reasons. Damages Response at 13.[9]

---

[8] *See, e.g.*, *Acetta v. Sec'y of Health & Hum. Servs.*, No. 17-1731V, 2021 WL 1718202 at * 5 (Fed. Cl. Spec. Mstr. Mar. 31, 2021) (noting that the petitioner herself had decided against surgery).

[9] *Allner v. Sec'y of Health & Hum. Servs.*, No. 19-1048V, 2022 WL 6962656, at *5 – 6 (Fed. Cl. Spec. Mstr. Sept. 9, 2022) (holding that the petitioner's SIRVA was "mild" - emphasizing a three-month initial treatment delay, only eight PT sessions, no recommendation of surgery, "multiple, lengthy" treatment gaps, and no "unique personal factors" that would have enhanced the petitioner's pain and suffering); *Klausen v. Sec'y*

Petitioner's request for a past pain and suffering award of $95,000.00 is reasonable based on her own evidence and citation to past cases. Brief at 20 – 24.[10] For example, *Meagher* similarly included an individual with some medical knowledge who self-treated a SIRVA for approximately two months prior to seeking formal treatment – which included similar numbers of therapeutic injections and formal therapy sessions. And Special Master Horner found that the *Meagher* petitioner's "medical records largely suggest that her right shoulder pain resolved" after her third steroid injection, which was about two years into the course. *Meagher*, 2023 WL 8713607 at *12.[11] Here I conclude that T.S.'s SIRVA substantially improved within a similar timeframe – but she also underwent one additional steroid injection, resigned from her job as a result of her injury, and financial obstacles stood in the way of her recommended shoulder surgery. In light of all of the above, $95,000.00 represents a reasonable award for her pain and suffering.

## Conclusion

As explained above, **I conclude that Petitioner has established onset and all other entitlement requirements for a Table SIRVA. Thus, Petitioner is entitled to compensation in this case.**

---

*of Health & Hum. Servs.*, No. 19-1977V, 2023 WL 2368823, at *5 -6 (Fed. Cl. Spec. Mstr. Feb. 2, 2023) (reflecting a three-month initial treatment delay, just 16 PT sessions and no alternative treatment efforts (such as the laser therapy reflected in T.S.'s case), and limited available evidence in light of the petitioner's death from unrelated causes while the case was pending); *Murray v. Sec'y of Health & Hum. Servs.*, No. 18-534V, 2020 WL 4522483, at *4 – 5 (Fed. Cl. Spec. Mstr. July 6, 2020) (reflecting that the petitioner's preexisting medical issues were equally if not more disruptive than her SIRVA – and the latter involved less than 20 PT sessions, no surgical intervention, and "was largely resolved within twelve months of vaccination").

[10] *Acetta*, 2021 WL 1718202 (awarding $95,000.00 for past pain and suffering); *Parsons v. Sec'y of Health & Hum. Servs.*, No. 19-1150V, 2023 WL 9069490 (Fed. Cl. Spec. Mstr. Nov. 30, 2023) ($90,000.00); *Meagher v. Sec'y of Health & Hum. Servs.*, No. 18-1572V, 2023 WL 8713607 (Fed. Cl. Spec. Mstr. Nov. 17, 2023) ($90,000.00).

[11] Respondent stated that "[t]he *Meagher* petitioner suffered the effects of her shoulder injury for over seven years." Damages Response at 16, citing 2023 WL 8713607 at *10 (summary of the petitioner's reply brief – not the special master's conclusion as to how long the injury lasted). Similarly, Respondent stated that the *Accetta* petitioner suffered "debilitating ongoing sequelae." Damages Response at 15, but that decision actually emphasizes that the *Accetta* petitioner's ongoing pain was "mild… manageable[, and she] was able to return to many of [her] regular activities." 2021 WL 1718202, at *5. For those reasons, T.S.'s experience seems at least comparable, if not worse, than what was established in those cases.

**Furthermore,** I award Petitioner a lump sum payment of **$97,672.00 (representing $95,000.00 for actual pain and suffering,**[12] **plus $2,672.00 for actual unreimbursable expenses).**[13] This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[14]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[12] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[13] The parties stipulated to the expenses. Brief at 24; Damages Response at n. 1.

[14] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.